[No. S130174. June 1, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL LYON THOMPSON, Defendant and Appellant.

**COUNSEL**

Richard B. Lennon, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas W. Sneddon, Jr., District Attorney, and Gerald McC. Franklin, Deputy District Attorney, for Plaintiff and Respondent.

David Labahn; George Kennedy, District Attorney (Santa Clara) and Neal J. Kimball, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A concerned citizen followed defendant, who was driving dangerously and under the influence of alcohol, through the streets of Santa Barbara in the early evening of July 21, 2003. Although defendant sped away

and managed to get home, the police, with that citizen's assistance, arrived at the house a short time later. The officers spoke to defendant, who remained inside the house and was visibly intoxicated. When defendant refused to come outside to have his blood tested for the presence of alcohol, the police became anxious about the dissipation of alcohol in his bloodstream and entered the house without a warrant to arrest him for the criminal offense of driving under the influence (DUI).

Relying on *Welsh v. Wisconsin* (1984) 466 U.S. 740 [80 L.Ed.2d 732, 104 S.Ct. 2091] (*Welsh*), the Court of Appeal determined that the Fourth Amendment categorically prohibits warrantless entries into the home to effect a DUI arrest when the asserted exigency is merely to prevent the destruction of blood-alcohol evidence. Based on its conclusion that the arrest was unlawful, the Court of Appeal suppressed all the evidence seized during and after the warrantless entry.

Because the Court of Appeal has misread *Welsh* and because exigent circumstances justified the warrantless entry to effect the DUI arrest here, we reverse the Court of Appeal. We therefore need not consider the People's additional argument that even if the arrest violated the Fourth Amendment, evidence seized outside the home subsequent to the arrest—including the results of a blood-alcohol test—are nonetheless admissible under *New York v. Harris* (1990) 495 U.S. 14 [109 L.Ed.2d 13, 110 S.Ct. 1640].

Background

On July 21, 2003, Madelene Orvos returned to her apartment complex in Santa Barbara from a walk at the beach with her dogs. She found defendant Daniel Lyon Thompson passed out in a white Ford Bronco in her assigned parking space. A neighbor came out, woke defendant up, and asked him to leave. Before defendant left, Orvos saw him stumble around, toss an empty vodka bottle out of the Bronco, and pass out a second time in the vehicle. She could tell he was intoxicated.

Having seen defendant in this condition on many prior occasions, Orvos decided this time to follow defendant and called 911 to report the situation as she got into her car. Defendant ran a red light and drove about 70 miles per hour when he got onto the freeway, at one point going "way to his right . . . close to the concrete on the side of the road." He exited the freeway and turned right onto State Street from the center lane. After defendant turned right onto South Ontare Road, Orvos fell behind because he was running stop signs and driving too fast in a neighborhood where children were present. Fortunately, Santa Barbara Police Officer Adrian Gutierrez arrived at 7:15

p.m., just as Orvos lost track of the Bronco. Gutierrez instructed Orvos to wait at the parking lot of the nearby golf course while he continued the pursuit.

Officer Gutierrez proceeded to 3610 San Jose Lane, which was the address of the Bronco's registered owner, and found the white Bronco parked in front. When Officer Ryan Dejohn arrived to assist, Gutierrez went back to update Orvos and asked her to follow him to identify the vehicle. After Orvos did so, Gutierrez touched the hood of the vehicle and discovered the hood was warm, indicating the Bronco had been driven very recently. He and Dejohn approached the front door, which was wide open, and rang the doorbell.

Slavka Kovarick answered the door. Officer Dejohn asked her who had been driving the Bronco. Kovarick said that Daniel owned the vehicle. Dejohn asked to speak to him, but Kovarick said he was asleep. When Dejohn asked whether she could wake Daniel up, Kovarick entered a bedroom directly to the left of the front door. She remained there a few moments and came back to tell them she could not wake Daniel up. She also refused to let the officers inside and instead walked away.

Officer Dejohn heard people speaking softly down the hall and then saw a tall shirtless White male, about 45 years old, leave the house and go into the backyard. This man, later identified as defendant, matched the description Orvos had provided of the driver. When defendant turned around, he made eye contact with Dejohn, who motioned for him to come to the front door. Defendant reentered the house and approached the officers by exiting the bedroom door near the entryway. He was staggering or swaying slightly, slurring his speech, and gave off a strong odor of alcohol. Dejohn, who addressed defendant as Daniel, explained that they suspected him of driving under the influence of alcohol and wanted to talk to him and perform some tests, but defendant refused to cooperate. As defendant began to walk away, Dejohn entered the house. He was afraid defendant might flee, so he placed his hand on defendant's shoulder. Defendant turned around and grabbed the doorjamb to the bedroom near the entryway. Officer Gutierrez entered the house only to assist Dejohn in effecting the arrest.

After defendant was handcuffed, Orvos identified defendant as the driver. His blood test revealed a blood-alcohol level of 0.21 percent. On the way to the jail, defendant told Officer Dejohn, "I'll kick your fucking ass."

Following a hearing on defendant's motion to suppress, the trial court found there was probable cause to arrest defendant based on Orvos's report of the driver's behavior, defendant's resemblance to the description Orvos

had provided of the driver, and defendant's visible intoxication. Under these circumstances, it was a "reasonable implication" that defendant was the driver. Relying on *People v. Hampton* (1985) 164 Cal.App.3d 27 [209 Cal.Rptr. 905], the trial court also found that the warrantless entry to arrest defendant was justified by exigent circumstances—i.e., the need to preserve the evidence of defendant's blood-alcohol level.

Defendant then pleaded no contest to driving with a blood-alcohol level in excess of 0.08 percent (Veh. Code, § 23152, subd. (b)) and to resisting an officer in the performance of his duties (Pen. Code, § 148, subd. (a)(1)) and admitted two prior convictions within the meaning of Vehicle Code section 23546. He was sentenced to 24 months, execution of which was suspended for three years under specified conditions.

A divided panel of the Appellate Division of the Santa Barbara County Superior Court affirmed the denial of the suppression motion, relying on "[t]he exigencies of preventing defendant from fleeing and possibly again driving while intoxicated, and of preserving evidence of his blood-alcohol content." The Court of Appeal transferred the matter under rule 62 of the California Rules of Court and reversed in a published opinion. The court disagreed that defendant "was likely to flee and again drive while intoxicated" and declared that the likelihood evidence of driving under the influence would be concealed or destroyed by the passage of time could not justify a warrantless entry into a residence under *Welsh.*

We granted the People's petition for review.

DISCUSSION

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." (*Devenpeck v. Alford* (2004) 543 U.S. 146, 152 [160 L.Ed.2d 537, 125 S.Ct. 588].) When, as here, the arrest occurs in the home, additional principles come into play. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (*Payton v. New York* (1980) 445 U.S. 573, 586 [63 L.Ed.2d 639, 100 S.Ct. 1371].) Indeed, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Id.* at p. 585.) The requirement of a warrant "minimizes the danger of needless intrusions of that sort." (*Id.* at p. 586.)

Yet, as with so much of its Fourth Amendment jurisprudence, the high court has stopped short of erecting a categorical bar. The presumption of

unreasonableness that attaches to a warrantless entry into the home "can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 88 S.Ct. 507]), such as ' "hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling" ' (*Minnesota v. Olson* (1990) 495 U.S. 91, 100 [109 L.Ed.2d 85, 110 S.Ct. 1684]). The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by one of these factors such as the imminent destruction of evidence or the need to prevent a suspect's escape." (*People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027].)

Defendant asserts that the warrantless entry here was unreasonable under the Fourth Amendment. He argues in particular that the police lacked probable cause to arrest him and that, even if probable cause existed, *Welsh* precluded a finding of exigent circumstances for warrantless DUI arrests in the home.

The trial court found that probable cause existed to arrest defendant and that the warrantless entry was justified by exigent circumstances. Because the underlying facts are undisputed, we review the trial court's rulings independently. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

### A. Did Probable Cause Exist to Justify an Arrest of Defendant for DUI?

■ We first consider whether the officers had probable cause to arrest defendant for DUI. "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . .' (*Illinois v. Gates* (1983) 462 U.S. 213, 232 [76 L.Ed.2d 527, 103 S.Ct. 2317].) It is incapable of precise definition. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371 [157 L.Ed.2d 769, 124 S.Ct. 795].) ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be . . . seized.' (*Ibid.*)" (*People v. Celis, supra,* 33 Cal.4th at p. 673.)

That standard was satisfied here. Although Madelene Orvos did not see defendant drinking, she did see him have difficulty walking, toss an empty

vodka bottle out of the Bronco, and pass out again in the vehicle. When he woke up, he drove erratically and too fast. He also ran red lights and stop signs. As defendant concedes, the record fully supported Orvos's belief, which she communicated to the police, that the driver of the Bronco was intoxicated. Orvos's report thus established probable cause to justify a warrantless arrest of the Bronco's driver. (Veh. Code, § 40300.5; *People v. Schofield* (2001) 90 Cal.App.4th 968, 972–975 [109 Cal.Rptr.2d 429]; see generally *People v. Smith* (1976) 17 Cal.3d 845, 852 [132 Cal.Rptr. 397, 553 P.2d 557] [citizen-informant who has personally observed the commission of a crime "is presumptively reliable"].)

The officers also had ample justification for suspecting that defendant had been the driver of the Bronco. The registered owner of the vehicle lived at 3610 San Jose Lane. A Bronco was parked in front of that residence, and Orvos confirmed that this was the vehicle she had just been following. Officer Gutierrez touched the Bronco's hood and concluded that it had been driven very recently. The officers went to the door and inquired who had been driving the Bronco. Slavka Kovarick said that the Bronco belonged to Daniel and that she "was going to call Daniel out" to speak to them. Kovarick went into the bedroom immediately to the left of the front door and came out a short time later to say she could not wake Daniel up. Shortly thereafter, Officer Dejohn heard quiet voices coming from down the hall and then saw defendant, a tall White male, approximately 45 years old and shirtless, walk out the back door. At Dejohn's invitation, defendant walked back into the house and approached the entryway by exiting through the bedroom door immediately to the left of the front door. He was staggering and swaying, slurring his speech, and smelled of alcohol. His appearance and demeanor matched the description of the driver provided by Orvos. He also had walked into and out of the bedroom that belonged to Daniel. The officers, having reasonable grounds for believing that defendant was Daniel and that Daniel was the driver, thus had probable cause to arrest him for DUI.

Defendant claims probable cause was nonetheless lacking because the description Orvos had provided was too general to justify suspicion of any individual person. He cites *People v. Curtis* (1969) 70 Cal.2d 347 [74 Cal.Rptr. 713, 450 P.2d 33], in which a "cursory description" of the suspect's race, color of clothing, and presence in the neighborhood where a prowler had been reported was deemed sufficient to justify a detention but not an arrest (*id.* at p. 350), and on *People v. Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658], in which the suspect's description as a fairly tall White man of large build with dark hair and a red sweater likewise failed to justify the arrest of a man matching that description who was merely in the "neighborhood" where a robbery had occurred more than 20 minutes earlier and was "driving toward the scene of the crime, not away from it." (*Id.* at pp. 450, 454.) But we have in this case much more than a vague description

of a suspect that happens to be matched by someone in the general neighborhood where a crime occurred. The Bronco was traced to a particular residence by its registration as well as by Orvos's visual identification and the fact the engine was still warm. Kovarick told the officers that Daniel, the owner of the Bronco, was indeed home and that she would tell him to come to the door. Only then did a man matching Orvos's description attempt to flee from the house, although he eventually came to the door—after passing through Daniel's bedroom. When the man arrived at the front door, the officers immediately could tell that he was intoxicated. These additional facts soundly distinguish *Curtis* and *Mickelson*. (*People v. Schader* (1965) 62 Cal.2d 716, 724 [44 Cal.Rptr. 193, 401 P.2d 665]; *In re Louis F.* (1978) 85 Cal.App.3d 611, 616 [149 Cal.Rptr. 642] ["*Curtis* and *Mickelson* should not be understood as standing for the proposition identification data furnished to a police officer can never alone be sufficient to justify a warrantless arrest unless there could *not* have been anyone other than the person arrested who could have fit the description. Rather, the question is one of degree. And when identification information of the kind here present is buttressed by additional probative evidence of complicity, it cannot be maintained probable cause was lacking"].)

Defendant also errs in supposing that the officers' lack of certainty defendant was the driver precludes a finding of probable cause. " '[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.' " (*Maryland v. Garrison* (1987) 480 U.S. 79, 87 [94 L.Ed.2d 72, 107 S.Ct. 1013].)

### B. Did Exigent Circumstances Justify a Warrantless Entry to Effect the Arrest?

■ The imminent destruction of evidence is an exigent circumstance justifying a warrantless entry into a residence to effect an arrest. (*People v. Celis, supra,* 33 Cal.4th at p. 676.) The People contend that the body's metabolization of alcohol qualified as the imminent destruction of evidence justifying a warrantless entry. Defendant disagrees, relying largely on *Welsh*.

*Welsh* held that the need to ascertain a suspect's blood-alcohol level did not justify a warrantless entry into a residence to effect an arrest for driving under the influence in Wisconsin. (*Welsh, supra,* 466 U.S. at pp. 753–754.) *Welsh* did not dispute the evanescent character of evidence of intoxication. Rather, the high court invalidated the arrest because "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." (*Id.* at p. 753; see also *Brigham City v. Stuart* (2006) 547 U.S. ___, ___ [164 L.Ed.2d 650, 659, 126 S.Ct. 1943].) "[T]he best indication of the State's interest in precipitating

an arrest," the court explained, is the classification of the offense and the possible punishment, which "can be easily identified both by the courts and by officers faced with a decision to arrest." (*Welsh, supra,* at p. 754.)

■ Defendant, like the Court of Appeal here, reasons that DUI is likewise a minor offense in California and, under *Welsh,* cannot justify a warrantless entry to effect an arrest. We disagree. Wisconsin has chosen to classify a first offense for DUI as a noncriminal, civil forfeiture offense for which no imprisonment is possible. (*Welsh, supra,* 466 U.S. at p. 754, citing Wis. Stat. § 346.65(2) (1975).) The issue thus presented in *Welsh,* as the high court explicitly stated, was whether "the Fourth Amendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for a *nonjailable* traffic offense." (*Welsh, supra,* 466 U.S. at p. 742, italics added.) California, by contrast, classifies a first offense for driving under the influence as a *criminal* act that is punishable by no more than six months and no less than 96 hours in jail. (Veh. Code, § 23536, subd. (a).) The possibility of imprisonment distinguishes DUI in California from DUI in Wisconsin.

Other factors confirm that, in California, driving under the influence is not an "extremely minor" offense within the meaning of *Welsh, supra,* 466 U.S. at page 753. When the Legislature amended Vehicle Code section 40300.5 to allow warrantless arrests for this misdemeanor offense not committed in the presence of the officer, it found and declared "that driving while under the influence of alcohol or drugs continues to pose a substantial danger to public health and safety, injuring over 65,000 people per year and killing an additional 2,400. Given the severity of the conduct involved, the exception in Section 40300.5 of the Vehicle Code from the general requirements of Section 836 of the Penal Code should be expanded to cover other instances in which the officer has reasonable cause to believe that the person to be arrested had been driving while under the influence of alcohol, drugs, or both." (Stats. 1984, ch. 722, § 2, pp. 2646–2647; see also *People v. Schofield, supra,* 90 Cal.App.4th at p. 973 ["The Legislature has recognized that driving under the influence is widespread and serious with potential for catastrophic consequences"].) This court, too, has recognized the "monstrous proportions of the problem" as well as "the horrific risk posed by those who drink and drive" (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732]) and has declared its "resolve to support 'all possible means of deterring persons from driving automobiles after drinking.' " (*Peterson v. Superior Court* (1982) 31 Cal.3d 147, 155 [181 Cal.Rptr. 784, 642 P.2d 1305].) We therefore believe *Welsh* was limited to Wisconsin's "amazing" decision to classify DUI as a civil nonjailable offense (*Welsh, supra,* 466 U.S. at p. 755 (conc. opn. of Blackmun, J.)) and not as a categorical bar on warrantless arrests in the home for DUI in the vast majority of states that, like California, classify it as a crime with the possibility of imprisonment.

(*People v. Hampton, supra,* 164 Cal.App.3d 27, 34; see also *Welsh, supra,* 466 U.S. at p. 761 (dis. opn. of White, J.) ["a bright-line distinction between felonies and misdemeanors is untenable"; "the Court—wisely in my view—does not adopt such an approach"].)

*Illinois v. McArthur* (2001) 531 U.S. 326 [148 L.Ed.2d 838, 121 S.Ct. 946] (*McArthur*), which construed the scope of exigent circumstances in the related circumstance of preventing a suspect from entering his own home, provides additional support for our understanding of *Welsh*. In *McArthur*, the police suspected that marijuana had been hidden underneath the couch of the trailer where McArthur was living. The police informed McArthur of their suspicions and asked for permission to search the trailer, which McArthur denied. While one officer went to get a search warrant, McArthur was told he could not reenter the trailer unless an officer accompanied him. McArthur then reentered the trailer two or three times, and each time an officer stood just inside the door to observe what McArthur did. About two hours later, an officer returned with the warrant and found a small amount of marijuana in the trailer. (*McArthur, supra,* 531 U.S. at p. 329.) Relying on *Welsh,* McArthur argued that misdemeanor possession of marijuana, which was punishable in Illinois by up to 30 days in jail, was too minor an offense to justify the warrantless restraint he had suffered. (*McArthur,* at pp. 335–336.) The high court disagreed, reiterating that " 'the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense' " (*id.* at p. 336, quoting *Welsh, supra,* 466 U.S. at p. 754, fn. 14.) and finding "significant distinctions" between "crimes that were 'jailable,' not 'nonjailable.' " (*McArthur,* at p. 336; see also *id.* at p. 337 (conc. opn. of Souter, J.) [observing that the risk of destruction of evidence of the misdemeanor would have justified a warrantless entry into the trailer].)

A substantial majority of our sister jurisdictions have limited *Welsh*'s holding to nonjailable offenses and have thereby rejected defendant's extension of its rule to misdemeanor offenses where imprisonment is a potential penalty. (*Mendez v. People* (Colo. 1999) 986 P.2d 275, 283 [distinguishing *Welsh* as involving "a minor, civil, nonjailable offense"]; *Dolan v. Salinas* (Conn.Super.Ct. 1999) 1999 Conn. Super. Lexis 1988, *13 ["Unlike the State of Wisconsin, Connecticut provides for incarceration on a first conviction" for DUI]; *Dyer v. State* (Fla.Dist.Ct.App. 1996) 680 So.2d 612, 613 [a misdemeanor punishable by up to a year in jail is "classified as a much more serious offense than in *Welsh*"]; *Threatt v. State* (1999) 240 Ga.App. 592 [524 S.E.2d 276, 280] (*Threatt*) [distinguishing *Welsh* because DUI, which is punishable by imprisonment of 10 days to 12 months, is "sufficiently serious criminal activity to justify an officer's warrantless, nonconsensual entry into a suspect's home to arrest the suspect"]; *People v. Lagle* (1990) 200 Ill.App.3d 948 [146 Ill.Dec. 551, 558 N.E.2d 514, 519] [distinguishing *Welsh* because

DUI, a misdemeanor, is "considered a serious offense in Illinois"]; *State v. Legg* (Iowa 2001) 633 N.W.2d 763, 773 [distinguishing *Welsh* because DUI, which is punishable by two days to one year in jail, is a "serious misdemeanor"]; *State v. Paul* (Minn. 1996) 548 N.W.2d 260, 267 [distinguishing *Welsh* because DUI is a misdemeanor and the legislature had authorized warrantless arrests for this offense when it occurs outside the officer's presence]; *City of Kirksville v. Guffey* (Mo.Ct.App. 1987) 740 S.W.2d 227, 229 [distinguishing *Welsh* because DUI is punishable by up to six months in jail]; *State v. Ellinger* (1986) 223 Mont. 349 [725 P.2d 1201, 1204] [distinguishing *Welsh* because DUI is a criminal offense with the possibility of imprisonment]; *State v. Nikola* (2003) 359 N.J. Super. 573 [821 A.2d 110, 118] [distinguishing *Welsh* because "in this State a charge of driving while under the influence of alcohol may subject an offender to a jail term of up to thirty days even for a first offense"]; *People v. Odenweller* (App.Div. 1988) 137 A.D.2d 15 [527 N.Y.S.2d 127, 129] [distinguishing *Welsh* because DUI is punishable by up to one year in jail]; *Beachwood v. Sims* (1994) 98 OhioApp.3d 9 [647 N.E.2d 821, 825] [distinguishing *Welsh* because DUI is a misdemeanor punishable by a minimum term of three days in jail]; *State v. Roberts* (1985) 75 Or. App. 292 [706 P.2d 564, 566] [distinguishing *Welsh* because DUI is a misdemeanor punishable by up to one year in jail]; *Beaver v. State* (Tex.Crim.App. 2003) 106 S.W.3d 243, 248 [distinguishing *Welsh* "from cases, such as this one, where the offense is 'jailable' "]; *City of Orem v. Henrie* (Utah Ct.App. 1994) 868 P.2d 1384, 1392 [distinguishing *Welsh* because DUI is a misdemeanor punishable by imprisonment]; *Cherry v. Com.* (2004) 44 Va.App. 347 [605 S.E.2d 297, 307] ["if any bright line exists for warrantless entries into the home, it should be drawn between jailable and nonjailable offenses rather than between felonies and misdemeanors"]; *State v. Griffith* (1991) 61 Wn.App. 35 [808 P.2d 1171, 1176 & fn. 7] [distinguishing *Welsh* as a case involving a noncriminal, civil forfeiture offense without possible imprisonment]; *Goines v. James* (1993) 189 W.Va. 634 [433 S.E.2d 572, 577–578] [distinguishing *Welsh* because DUI is a serious traffic offense punishable by up to six months in jail]; *State v. Hughes* (2000) 2000 WI 24 [607 N.W.2d 621, 631] [distinguishing *Welsh* because the misdemeanor offense was punishable by up to six months in jail]; *Rideout v. State* (2005) 2005 WY 141 [122 P.3d 201, 210] ["The unmistakable implication of the discussion in *McArthur* is that the distinction drawn by the Court in *Welsh* between minor offenses that do not justify a warrantless entry into a residence and those offenses that do is predicated upon whether the subject offense carries a potential jail term"]; accord, *Joyce v. Town of Tewksbury, Mass.* (1st Cir. 1997) 112 F.3d 19, 22 (en banc) ["the fact that Massachusetts classifies the alleged violation here as a misdemeanor does not reduce it to a 'minor offense' " within the meaning of *Welsh*].)

Against this impressive array of authority, we have found only three courts that, like the Court of Appeal below, have extended *Welsh* to misdemeanors carrying a possibility of imprisonment. In *Patzner v. Burkett* (8th Cir. 1985) 779 F.2d 1363, the Eighth Circuit asserted, without much analysis, that the punishment for DUI in North Dakota—a minimum sentence of a $100 fine or three days in jail—was only a "minor difference in penalty" and thus was "not sufficient to support a result different from that reached in *Welsh*," inasmuch as the state had since amended its statute to eliminate the possibility of imprisonment for first-time offenders. (*Patzner, supra,* 779 F.2d at pp. 1368–1369 & fn. 6.) In *State v. Flegel* (S.D. 1992) 485 N.W.2d 210, the South Dakota Supreme Court made the remarkable assertion that the misdemeanor penalties for first-offense DUI, which ranged up to one year in jail, were "similar" to those attaching to the *nonjailable* traffic offense in *Welsh* and the misdemeanor penalties in *Patzner.* (*Flegel, supra,* 485 N.W.2d at p. 215.) And in *Norris v. State* (1999) 338 Ark. 397 [993 S.W.2d 918], the Arkansas Supreme Court held that DUI, which was punishable by up to one year in jail, was "relatively minor" when compared to criminal offenses involving violence or the threat of violence. (*Id.* at p. 923; but see 3 LaFave, Search and Seizure (4th ed. 2004) § 6.1(f), p. 316, fn. 211 [criticizing *Norris*].)

We do not find these decisions persuasive. First of all, they ignore *Welsh* itself, which cautions that the critical factor is not the nature of the crime but "the penalty that may attach to any particular offense." (*Welsh,* 466 U.S. at p. 754, fn. 14; see also Colb, *The Qualitative Dimension of Fourth Amendment "Reasonableness"* (1998) 98 Colum. L.Rev. 1642, 1683 ["If Wisconsin were unhappy with the Court's decision, it could, therefore, nullify it prospectively by simply changing (legislatively) the status of driving while intoxicated from a civil violation to a criminal offense"].) Indeed, they all predate *McArthur*, which clarified that the significant distinction for Fourth Amendment purposes in an analogous context is whether the crimes were " 'jailable' " or " 'nonjailable.' " (*McArthur, supra,* 531 U.S. at p. 336.) Moreover, none of these cases acknowledges the substantial weight of authority limiting *Welsh* to nonjailable offenses—or even cites a single contrary case. Finally, a bright-line rule limiting warrantless entries to felonies "would send a message to the 'bad man' who drinks and drives that a hot pursuit or arrest set in motion can be thwarted by beating the police to one's door. The Fourth Amendment simply cannot be stretched nor can public safety be ensured by a bright-line felony rule which would encourage drunk drivers to elude the police by racing through the streets to the sanctuary of their houses in order to 'freeze' a hot pursuit or to otherwise evade a lawful arrest." (*State v. Paul, supra,* 548 N.W.2d at p. 268.)

If, as we have concluded, a finding of exigent circumstances in DUI cases is not categorically precluded by *Welsh*, we must next consider whether

exigent circumstances justified the warrantless entry in this particular case. The People rely on the exception to the warrant requirement for the imminent destruction of evidence. They point out (1) that defendant's blood-alcohol level would have diminished while the police sought a warrant as the body metabolized the alcohol, and (2) that defendant could have masked his blood-alcohol level while the police sought a warrant by ingesting more alcohol. The People's concerns are well founded.

It is beyond dispute that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." (*Schmerber v. California* (1966) 384 U.S. 757, 770 [16 L.Ed.2d 908, 86 S.Ct. 1826].) Because the "delay necessary to procure a warrant . . . may result in the destruction of valuable evidence," "blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible." (*Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 623 [103 L.Ed.2d 639, 109 S.Ct. 1402].) Neither defendant nor the dissenting opinion here offers any reason why the dissipation of blood-alcohol evidence may be deemed to threaten the imminent destruction of evidence in *Schmerber* and in *Skinner* but not in this case. Nor does defendant offer any authority for his assertion at oral argument that the exigent circumstance relating to the imminent destruction of evidence encompasses only that evidence which qualifies as contraband or as an instrumentality of a crime. To the contrary, most courts have concluded that the dissipation of blood-alcohol evidence "may constitute an exigent circumstance under the facts of a particular case." (*City of Orem v. Henrie, supra,* 868 P.2d at p. 1389; accord, *Threatt, supra,* 524 S.E.2d at p. 281, fn. 1 ["when an officer has probable cause to arrest for the offense of DUI, the need to prevent destruction of evidence (which may occur by the dissipation of alcohol from a DUI suspect's blood while a warrant is obtained) may constitute an exigent circumstance which could justify a nonconsensual, warrantless entry into the suspect's home to arrest the suspect"]; *State v. Komoto* (1985) 40 Wn.App. 200 [697 P.2d 1025, 1033] ["This proposition is generally accepted by federal and state courts"]; *State v. Bohling* (1993) 173 Wis.2d 529 [494 N.W.2d 399, 404–405] [citing cases]; *U.S. v. Reid* (4th Cir. 1991) 929 F.2d 990, 993–994.)[1]

---

[1] The dissent concedes that the dissipation of blood-alcohol evidence may constitute an exigent circumstance to justify a warrantless entry to effect an arrest, but would limit such arrests to crimes "far more serious than mere driving under the influence." (Dis. opn., *post,* at p. 833.) The text of the Fourth Amendment, however, offers no basis for distinguishing between DUI, which is a serious and jailable offense in California (see *ante,* at pp. 821–822), and the crimes alleged in *Henrie* and *Komoto,* nor does the dissent point to any case law to support such a distinction. Indeed, inasmuch as the dissent concedes that the nonjailable offense in *Welsh* is distinguishable from the jailable offense in this case (dis. opn., *post,* at p. 830), the line the dissent would draw between this case and *Henrie* or *Komoto* remains undefined.

Defendant contends that no exigency existed because there is a rebuttable presumption that a driver had a blood-alcohol level of 0.08 percent or more at the time of driving if the person had a blood-alcohol level of 0.08 percent or more in a chemical test performed "within three hours after the driving." (Veh. Code, § 23152, subd. (b).) Defendant misapprehends the significance of this provision, which is not a presumption at all, but only a permissive inference. (Judicial Council of Cal., Jury Instns. (2006) Bench Note to CALCRIM No. 2111, p. 149; accord, Use Note to CALJIC No. 12.61.1 (Jan. 2005 ed.) p. 845.) That the jury may, but is not required to, conclude that defendant's blood-alcohol level was in excess of legal limits based on a test taken within three hours of the driving does not eviscerate the People's interest in securing a blood test as soon as possible. (*State v. Bohling, supra,* 494 N.W.2d at p. 405; *City of Orem v. Henrie, supra,* 868 P.2d at p. 1393, fn. 10 [such a limitation "evinces the Legislature's intent to promote the rapid attainment of chemical tests for alcohol content"].)

We are likewise unpersuaded by defendant's claim that any exigency is eliminated because of the possibility an expert could testify about the defendant's blood-alcohol level at an earlier point "by extrapolating backward from the later-taken results." As courts have recognized, "such extrapolations can be speculative." (*State v. Bohling, supra,* 494 N.W.2d at p. 405.) "[T]here are numerous variables such as weight, or time and content of last meal which may affect the rate at which the alcohol dissipates." (*Carleton v. Superior Court* (1985) 170 Cal.App.3d 1182, 1185 [216 Cal.Rptr. 890]; see also *Bennett v. Coffman* (1987) 178 W.Va. 500 [361 S.E.2d 465, 469] [degree of physical exertion can affect body's metabolism of alcohol].)[2]

In any event, none of defendant's arguments is responsive to the corruption of evidence that occurs when the suspect takes advantage of any delay to ingest more alcohol—or to claim to have done so—or when the suspect evades police capture until he or she is no longer intoxicated. Numerous courts have recognized this possibility as an additional reason supporting a finding of exigent circumstances in DUI cases. (*Welsh, supra,* 466 U.S. at

---

[2] Defendant also argues that a person suspected of DUI may refuse to submit to chemical testing and accept the specified punishment, rendering the blood-alcohol evidence superfluous. Defendant once again misapprehends the statutory scheme. A person who drives a motor vehicle "is deemed to have given his or her consent to chemical testing" of his or her blood, breath, or urine for the purpose of determining the alcohol or drug content of his or her blood (Veh. Code, § 23612, subds. (a)(1)(A) & (B), (d)(2)). "It is [thus] firmly established that a drunken driver has no *right* to resist or refuse such a test." (*Bush v. Bright* (1968) 264 Cal.App.2d 788, 792 [71 Cal.Rptr. 123].) Moreover, the possibility of sanctions under Vehicle Code section 13353 for the driver's refusal to submit to chemical tests does not preclude the People from also obtaining a blood sample without any further approval, based on the consent any driver has given under section 23612, and punishing the driver for the criminal act of driving under the influence. (*Covington v. Department of Motor Vehicles* (1980) 102 Cal.App.3d 54, 60 [162 Cal.Rptr. 150]; *People v. Fite* (1968) 267 Cal.App.2d 685, 690–691.)

p. 763 (dis. opn. of White, J.); *State v. Lovig* (Iowa 2004) 675 N.W.2d 557, 566 & fn. 2; *State v. Legg, supra,* 633 N.W.2d at pp. 772–773; *State v. Seamans,* (Me.Super.Ct., Aug. 2, 2005, No. CR-04-770) 2005 Me.Super. Lexis 105, *11, fn. 3; *State v. Paul, supra,* 548 N.W.2d at p. 267; *City of Kirksville v. Guffey, supra,* 740 S.W.2d at p. 229; *People v. Odenweller, supra,* 527 N.Y.S.2d at p. 129; *Stark v. N. Y. State Dept. of Motor Vehicles* (App.Div. 1984) 104 A.D.2d 194 [483 N.Y.S.2d 824, 826–827], affd. (1985) 65 N.Y.2d 720 [492 N.Y.S.2d 8, 9, 481 N.E.2d 548]; *City of Orem v. Henrie, supra,* 868 P.2d at p. 1393; *State v. Komoto, supra,* 697 P.2d at p. 1033.) In this case, the corruption of evidence was not merely a theoretical possibility. The officers had good reason to believe that defendant, who had attempted to flee out the back door upon learning of their presence, would escape again or otherwise act to conceal his intoxication if given the opportunity. (See *People v. Murphy* (2005) 37 Cal.4th 490, 500 [36 Cal.Rptr.3d 125, 123 P.3d 155].) Time was of the essence here.

In holding that exigent circumstances justified the warrantless entry here, we need not decide—and do not hold—that the police may enter a home without a warrant to effect an arrest of a DUI suspect in *every* case. We hold merely that the police conduct here, taking into account all of the circumstances, was reasonable—with reasonableness measured as " 'a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 109 [54 L.Ed.2d 331, 98 S.Ct. 330]; accord, *People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333] ["There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers"].)

The state's interest in effecting an arrest here was substantial. There was strong evidence that defendant had committed the dangerous act of DUI, a jailable offense. Officer Dejohn feared, however, the evidence of that crime was in imminent danger of destruction. His suspicions were justified. Slavka Kovarick had told the police, alternately, that defendant would be coming to the door soon, and that he was asleep and could not be woken up, but he was in fact neither sleeping nor coming to the door. Instead, he spoke quietly in the hall with Kovarick and then walked away from the officers into the backyard. The police were able to see defendant leave the house only because the front door was open, and defendant returned to the house only after Officer Dejohn made eye contact with him and motioned for him to come back in. Having attempted to flee once, defendant was at risk of doing so again if he was not promptly taken into custody. Had he escaped, the evidence of his crime would have dissipated. Even if he had been prevented from escaping, he had already demonstrated plainly his desire to evade police investigation and could have corrupted the evidence simply by resuming

drinking. The police thus had ample cause to believe defendant was inside the house and that the evidence was at risk of imminent destruction, as the superior court found. (Cf. *Vale v. Louisiana* (1970) 399 U.S. 30, 34–35 [26 L.Ed.2d 409, 90 S.Ct. 1969] [no exigency existed where the officers had no basis for suspecting anyone was inside the house or about to destroy the narcotics].)

The Court of Appeal emphasized in particular that the police had not conducted a hot pursuit in that the pursuit was initiated by a citizen and the police did not observe defendant driving or entering the house. Even if the definition of hot pursuit were to exclude the situation here (but see *People v. Escudero* (1979) 23 Cal.3d 800, 810 [153 Cal.Rptr. 825, 592 P.2d 312] ["it is not necessary that the suspect be kept physically in view at all times"]), it is clear that defendant had arrived at the house only minutes before the police. The police thus had reasonable cause to believe the evidence of defendant's intoxication would be fresh at the time of his arrest.

The intrusion on defendant's privacy, by contrast, was a diminished one. Kovarick had left the front door wide open during the entire encounter. This not only rendered a forcible entry unnecessary, but it also exposed to public view the very area where the arrest would later occur. (Cf. *U.S. v. Gori* (2d Cir. 2000) 230 F.3d 44, 53 ["Once the apartment was opened to public view by the defendants in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall"]; *U.S. v. Vaneaton* (9th Cir. 1995) 49 F.3d 1423, 1427.) Moreover, Officer Dejohn entered only a few feet beyond the threshold, and Officer Gutierrez followed only when it became apparent that his assistance was necessary to overcome defendant's resistance. Neither conducted a search of the residence. In short, the state's intrusion into the home was the minimum necessary to effect the arrest and extended only to areas already exposed to public view. Under these circumstances, it was reasonable for the police to enter the home without a warrant in order to arrest defendant and thereby prevent the imminent destruction of evidence of his crime.[3]

In light of our holding, we find it unnecessary to address the People's additional argument that even if the warrantless entry had violated the Fourth Amendment, the exclusionary rule would not extend to the officers' observations of defendant outside the house, any statements defendant made prior to the entry or after defendant was removed from the house, or the results of his blood-alcohol test. (See *New York v. Harris, supra,* 495 U.S. at p. 19; *People v. Marquez* (1992) 1 Cal.4th 553, 569 [3 Cal.Rptr.2d 710, 822 P.2d 418].)

---

[3] To the extent dictum in *People v. Schofield, supra,* 90 Cal.App.4th at pages 970 and 975, is inconsistent with the views expressed herein, it is disapproved.

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Kennard, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.**, Dissenting.—"[A] man's house is his castle." (*Miller v. United States* (1958) 357 U.S. 301, 307 [2 L.Ed.2d 1332, 78 S.Ct. 1190].) This phrase expresses the view that one's home is a place of personal privacy and its inhabitants are entitled to freedom from governmental intrusion absent a very good reason. "At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable." (*United States v. Karo* (1984) 468 U.S. 705, 714 [82 L.Ed.2d 530, 104 S.Ct. 3296], quoted with approval in *People v. Camacho* (2000) 23 Cal.4th 824, 831 [98 Cal.Rptr.2d 232, 3 P.3d 878].) "We have, after all, lived our whole national history with an understanding of 'the ancient adage that a man's home is his castle [to the point that t]he poorest man may in his cottage bid defiance to all the forces of the Crown.' " (*Georgia v. Randolph* (2006) 547 U.S. 103, 115 [164 L.Ed.2d 208, 126 S.Ct. 1515, 1524].)

Not just some forgotten vestige of 15th century English law that allowed English peasants to assert their rights against a powerful monarchy, the view that one's home is a place of privacy was also shared by the framers of the United States Constitution. We need not interpret or gloss the constitutional text for hidden or obscure meaning, for the drafters of the Fourth Amendment made this point plain on the face of the document: "The right of the people to be secure in their persons, *houses,* papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." (U.S. Const., 4th Amend., italics added.)

The United States Supreme Court has emphasized repeatedly the primacy of the constitutional protection for persons in their homes. " '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Payton v. New York* (1980) 445 U.S. 573, 585 [63 L.Ed.2d 639, 100 S.Ct. 1371].) "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman v. United States* (1961) 365 U.S. 505, 511 [5 L.Ed.2d 734, 81 S.Ct. 679].) The high court has been vigilant in extending this concept in the face of new technological threats to the sanctity of the home. (See *Kyllo v. United States* (2001) 533 U.S. 27, 28 [150 L.Ed.2d 94, 121 S.Ct. 2038] [warrantless use of

a thermal imaging device to explore details inside home violated 4th Amend.]; *United States v. Karo, supra,* 468 U.S. 705 [warrantless placement of a beeper into a home violated 4th Amend.].)

This court has also on numerous occasions recognized this special constitutional protection for persons in their homes. For example, we held a warrantless search of a suspect's home could not be justified by a parole search condition of which police were unaware (*People v. Sanders* (2003) 31 Cal.4th 318, 324 [2 Cal.Rptr.3d 630, 73 P.3d 496]); that, absent more, the warrantless entry into a suspect's home was not justified solely by the arrest of the suspect outside the home (*People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027]); that a person's expectation of privacy in the home was not compromised by his exposure of the home's interior to a private side yard (*People v. Camacho, supra,* 23 Cal.4th 824); and that the presumptive constitutional protection of the home extended to an attached garage (*People v. Robles* (2000) 23 Cal.4th 789, 795 [97 Cal.Rptr.2d 914, 3 P.3d 311]; see Cal. Const., art. I, § 13). Perhaps our seminal case in this area is *People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333], where we held the warrantless entry into a suspect's home to make an arrest, even though supported by probable cause to believe he was guilty of a felony, was unreasonable per se under the Fourth Amendment to the United States Constitution and the state Constitution, at least in the absence of exigent circumstances. Four years later, the United States Supreme Court came to this view itself, holding in *Payton v. New York* that, in the absence of exigent circumstances, police entry into a suspect's home to arrest him for a felony was "presumptively unreasonable" in the absence of a warrant. (*Payton v. New York, supra,* 445 U.S. at p. 586.)

I agree with the majority that *Welsh v. Wisconsin* (1984) 466 U.S. 740 [80 L.Ed.2d 732, 104 S.Ct. 2091], wherein the high court concluded the warrantless arrest of a suspected drunk driver in his home was invalid, may plausibly be distinguished from the instant case on the ground the crime at issue in that case was not a jailable offense. (Maj. opn., *ante,* at pp. 820–821; *Welsh v. Wisconsin,* at pp. 742 [emphasizing crime was "a nonjailable traffic offense"], 753 ["important factor" was "the gravity of the underlying offense" and that crime was "a noncriminal, traffic offense"].) But even assuming *Welsh* is distinguishable from the instant case on the ground that incarceration is a possible punishment for drunk driving in California, I am not persuaded police were legally entitled, on the facts of this case, to enter defendant's home against his wishes without a warrant. The majority concedes, as it must, the Fourth Amendment's presumptive protection of persons in their homes, but reasons the warrantless entry into this defendant's home was justified by exigent circumstances. Because I disagree such circumstances existed here, and because I also find the majority's attempt to circumscribe the sweep of its holding unpersuasive, I dissent.

**I**

The ultimate standard established by the Fourth Amendment to the United States Constitution is one of reasonableness. (*Cady v. Dombrowski* (1973) 413 U.S. 433, 439 [37 L.Ed.2d 706, 93 S.Ct. 2523].) Beginning with the unassailable proposition that the warrantless entry by government agents into a person's home is "presumptively *unreasonable*" (*Payton v. New York, supra,* 445 U.S. at p. 586, italics added), courts have nevertheless recognized some " 'specifically established and well-delineated exceptions' to the warrant requirement (*Katz v. United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 88 S.Ct. 507]), such as ' "hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling" ' (*Minnesota v. Olson* (1990) 495 U.S. 91, 100 [109 L.Ed.2d 85, 110 S.Ct. 1684])." (*People v. Celis, supra,* 33 Cal.4th at p. 676.) "A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement." (*Flippo v. West Virginia* (1999) 528 U.S. 11, 13 [145 L.Ed.2d 16, 120 S.Ct. 7]; *People v. Wharton* (1991) 53 Cal.3d 522, 576–577 [280 Cal.Rptr. 631, 809 P.2d 290] [same].)

Once defendant demonstrated that police entered his home without a warrant, the burden shifted to the prosecution "to prove that the entry was nevertheless reasonable." (*People v. Williams* (1988) 45 Cal.3d 1268, 1300 [248 Cal.Rptr. 834, 756 P.2d 221].) Police admittedly did not have an arrest warrant permitting them to enter defendant's home and had been expressly denied consent to enter by defendant's housemate. (*Georgia v. Randolph, supra,* 547 U.S. 103 [164 L.Ed.2d 208, 126 S.Ct. 1515].) Although the majority hints otherwise (maj. opn., *ante,* at pp. 827–828), the forced entry cannot be justified under the hot pursuit doctrine, as "there was no immediate or continuous pursuit . . . from the scene of a crime." (*Welsh v. Wisconsin, supra,* 466 U.S. at p. 753.) Defendant had already arrived home, he was apparently sleeping in his bedroom, and police were on the scene; hence, "there was little remaining threat to the public safety." (*Ibid.*)

The majority concludes the failure by police to obtain a warrant before entering defendant's home is excused by the exigent-circumstances exception to the warrant requirement. " ' " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." ' [Citations.] The exception is applicable to the federal Constitution (see *Mincey v. Arizona*

(1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408]) and 'California courts are in full accord with the . . . emergency exception to the warrant requirement.' " (*People v. Wharton, supra,* 53 Cal.3d at p. 577.)

"In evaluating exigency, relevant factors include ' " . . . (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.' " ' " (*People v. Gentry* (1992) 7 Cal.App.4th 1255, 1261–1262 [9 Cal.Rptr.2d 742].)

The majority locates such an emergency situation inside defendant's body, which was slowly but inexorably metabolizing and thus destroying the alcohol police believed he had consumed. The emergency, in other words, involved the potential destruction of the evidence of defendant's crime of drunk driving. That such "burn off" occurs is undisputed. (*People v. Schofield* (2001) 90 Cal.App.4th 968, 975 [109 Cal.Rptr.2d 429]; see *In re Martin* (1962) 58 Cal.2d 509, 512 [24 Cal.Rptr. 833, 374 P.2d 801] ["It is a matter of common knowledge that the intoxicating effect of alcohol diminishes with the passage of time"].) What is disputed is whether this natural metabolic process, standing alone, constitutes an emergency such that police may dispense with obtaining a warrant and immediately enter a person's home against his will.

None of the cases on which the majority relies supports its broad conclusion that the natural metabolization of blood alcohol alone constitutes an exigent circumstance sufficient to permit police to enter a person's home against his or her wishes and without a warrant. For example, in *Schmerber v. California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], the United States Supreme Court cited the natural metabolization of a body's blood alcohol to justify the police taking a nonconsensual blood sample from a suspect notwithstanding the lack of a search warrant. But the defendant in *Schmerber* had already been arrested and was in police custody, not in his home. Moreover, the fact of the alcohol burn off was just one factor the high court considered: "We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. *Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.* Given these special facts, we conclude that the attempt to secure

evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." (*Id.* at pp. 770–771, italics added.) No such time pressures or "special facts" were shown in the instant case; indeed, police were on the scene just minutes after defendant apparently had taken his last drink. (See *Vale v. Louisiana* (1970) 399 U.S. 30, 35 [26 L.Ed.2d 409, 90 S.Ct. 1969] [in finding no exigent circumstances, court emphasized absence of evidence showing that obtaining a warrant was "impracticable"].)

Similarly, in *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602 [103 L.Ed.2d 639, 109 S.Ct. 1402], the high court merely recognized that "alcohol and other drugs are eliminated from the bloodstream" (*id.* at p. 623), a point no one disputes; it did not hold such elimination constituted an exigent circumstance entitling police to enter one's home without a warrant. Instead, the court held the warrant requirement was excused because the government's interest in regulating railway workers presented a special need beyond normal law enforcement. (*Id.* at p. 620.)

The majority opines that "most courts have concluded that the dissipation of blood-alcohol evidence '*may* constitute an exigent circumstance *under the facts of a particular case.*' " (Maj. opn., *ante,* at p. 825, italics added.) The qualifiers are important. The cases the majority cites in support are all distinguishable. In *City of Orem v. Henrie* (Utah Ct.App. 1994) 868 P.2d 1384, the defendant was suspected not only of driving while intoxicated, but also of leaving the scene of an accident. In *State v. Komoto* (1985) 40 Wn.App. 200 [697 P.2d 1025], the defendant struck and killed a pedestrian. In both cases, the blood-alcohol evidence was needed to prosecute crimes far more serious than mere driving under the influence (DUI). The warrantless entry into a home may therefore have been justified. Here, by contrast, defendant was suspected only of driving while intoxicated, and at the time police entered his home any threat to public safety had ceased.

The majority also cites *State v. Bohling* (1993) 173 Wis.2d 529 [494 N.W.2d 399], and *U.S. v. Reid* (4th Cir. 1991) 929 F.2d 990, in support (maj. opn., *ante,* at p. 825), but in both cases the defendants were lawfully arrested *outside the home,* at the scene of a traffic accident (*Bohling*) or at a traffic stop on the highway (*Reid*); their challenges were to the warrantless drawing of a blood sample. The cases thus presented a straightforward application of *Schmerber v. California, supra,* 384 U.S. 757, and do not support the notion that the mere dissipation of blood-alcohol evidence, standing alone, creates such an emergency that police may enter a suspect's home without a warrant or consent.

Finally, the majority cites *Threatt v. State* (1999) 240 Ga.App. 592, 596 [524 S.E.2d 276], but that case held, on facts similar to those here, that exigent circumstances did *not,* in fact, exist to authorize the warrantless entry to arrest for the crime of reckless driving. The Georgia appellate court then stated in dictum that—had officers possessed probable cause to arrest for driving under the influence—the dissipation of evidence *"may* constitute an exigent circumstance." (*Id.* at p. 596, fn. 1, italics added.) In support, the *Threatt* court cited *State v. Tosar* (1986) 180 Ga.App. 885, 888 [350 S.E.2d 811], a case that did not involve entry into a home.

Invocation of the exigent-circumstances exception to the warrant requirement, moreover, must be supported by a showing of the " '*imminent* destruction of evidence.' " (*Minnesota v. Olson, supra,* 495 U.S. at p. 100, italics added; see also *Brigham City v. Stuart* (2006) 547 U.S. ___, ___ [164 L.Ed.2d 650, 657, 126 S.Ct. 1943] [destruction of evidence must be "imminent"].) The prosecution made no showing in this case that the delay in obtaining a warrant would have resulted in the *imminent destruction,* as opposed to the gradual and incremental degradation, of the alcohol in defendant's body. Indeed, a delay of an hour or two to obtain a warrant would have made little difference, for "[i]t is common . . . for experts to take into account the metabolization rate of a substance and extrapolate from the amount of a substance in a blood sample to arrive at an opinion regarding the amount of the substance in the blood at a critical point in time." (*People v. Clark* (1993) 5 Cal.4th 950, 993 [22 Cal.Rptr.2d 689, 857 P.2d 1099].) The majority disparages the efficacy of so-called retrograde extrapolation evidence, asserting such evidence " 'can be speculative' " (maj. opn., *ante,* at p. 826), but surely it does not mean to suggest the admissibility of this type of evidence is suspect. In any event, the rule in this state (*People v. Clark, supra,* 5 Cal.4th 950)[1] and, indeed, in the majority of jurisdictions, is that retrograde extrapolation evidence is admissible, though of course its weight is subject to challenge, as are the qualifications of the expert witness presenting the evidence. (See generally Annot., Admissibility and Sufficiency of Extrapolation Evidence in DUI Prosecutions (2004) 119 A.L.R.5th 379.)

To further support its contention the exigent-circumstances doctrine applies here, the majority relies on the possibility defendant could have corrupted the evidence of his alcohol consumption by consuming more alcohol. (Maj. opn., *ante,* at p. 826.) But this argument proves too much, for the possibility exists *in every case* that a criminal suspect in his home will try to destroy evidence

---

[1] See also Vehicle Code section 23152, subdivision (b) which states in part: "In any prosecution under this subdivision, it is a rebuttable presumption that the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after the driving."

of his crime. The drug dealer may flush his stash away, the bookie may burn his betting slips, the killer may take a metal file to the barrel of his gun or clean his hands of gunshot residue. The mere possibility a defendant may drink additional quantities of liquor is insufficient to overcome the constitutionally protected privacy interests of a person in his home. Instead, police must have *articulable facts* that would lead a reasonable officer to believe such destruction is *about to occur.* " ' "[F]ear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home." [Citation.] Instead, "[t]here must exist 'specific and articulable facts which, taken together with rational inferences . . . ,' support the warrantless intrusion." ' " (*People v. Gentry, supra,* 7 Cal.App.4th at p. 1262.)

*Vale v. Louisiana, supra,* 399 U.S. 30, illustrates this basic point of law. In that case, after police arrested the defendant outside a home, they entered the home without a warrant to search for drugs. The Louisiana Supreme Court upheld the search, in part, because the crime "involved narcotics, which are easily removed, hidden, or destroyed. It would be unreasonable, the Louisiana court concluded, 'to require the officers under the facts of the case to first secure a search warrant before searching the premises, as time is of the essence inasmuch as the officers never know whether there is anyone on the premises to be searched who could very easily destroy the evidence.' " (*Id.* at p. 34.) The United States Supreme Court flatly rejected the state court's reasoning, explaining: "Such a rationale could not apply to the present case, since by their own account the arresting officers satisfied themselves that no one else was in the house when they first entered the premises. But entirely apart from that point, our past decisions make clear that only in 'a few specifically established and well-delineated' situations [citation] may a warrantless search of a dwelling withstand constitutional scrutiny." (*Ibid.*) Because there was no evidence someone was about to remove or destroy evidence, the high court held the exigent-circumstances exception did not apply.

As in *Vale v. Louisiana, supra,* 399 U.S. 30, the prosecution in this case presented no evidence suggesting defendant was about to alter evidence of his guilt by drinking again. Neither Officer Gutierrez nor Officer Dejohn observed defendant drinking, or attempting to drink, any intoxicating beverage. Witness Madelene Orvos reported that defendant had discarded an empty bottle of vodka. Defendant's housemate, Slavka Kovarick, told police defendant was sleeping, which was apparently the case until police instructed her to awaken him. Although the majority opines that "[t]he officers had good reason to believe that defendant . . . would . . . act to conceal his intoxication if given the opportunity" (maj. opn., *ante,* at p. 827), the record confirms police possessed no articulable facts suggesting defendant was actively corrupting, or about to corrupt, the blood-alcohol evidence by resuming his consumption of alcohol. By accepting in support of exigency the argument

that defendant *could* corrupt the evidence, the majority converts the narrow exigent-circumstances exception to the constitutional warrant requirement into a free pass for police: So long as the destruction of evidence is *possible*, police may dispense with a warrant. But the possibility a suspect will destroy evidence exists *in every case*; that possibility thus cannot be the predicate for invoking the narrow exigent-circumstances exception to the constitutional requirement for a warrant. (Cf. *People v. Gonzalez* (1989) 211 Cal.App.3d 1043, 1050 [259 Cal.Rptr. 846] ["If specific indications of . . . destruction of evidence were not required, the exigent-circumstances exception would entirely consume" the knock-notice requirement].)

Realizing, perhaps, that none of its previous rationales adequately justify the warrantless entry, the majority suggests defendant had attempted to flee. (Maj. opn., *ante,* at pp. 827–828.) This suggestion finds no support in the record. Officer Dejohn testified defendant, on learning police were on his doorstep, left his house by the back door, walked about 10 feet into the backyard, and then returned to the house. Although this caused Dejohn to be concerned defendant would flee, he admitted defendant was so intoxicated that he was staggering and slurring his words and that he immediately returned to the house. But even assuming defendant might have attempted to flee, that possibility did not create an emergency situation justifying the warrantless entry. Police at the scene could easily have detained him while they sought a warrant. In any event, the prosecution did not argue below that defendant's asserted attempt to flee created an emergency situation, and the trial court did not mention this circumstance. The court denied defendant's suppression motion solely on the ground that his body's metabolization of alcohol in his blood constituted the destruction of evidence. (See *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640–641 [108 Cal.Rptr. 585, 511 P.2d 33] [People cannot change theory on appeal of suppression decision].)

Finally, the majority attempts to minimize the scope of its holding, explaining that it does not decide "that the police may enter a home without a warrant to effect an arrest of a DUI suspect in *every* case. We hold merely that the police conduct here, taking into account all of the circumstances, was reasonable . . . ." (Maj. opn., *ante,* at p. 827.) I find the majority's attempt to circumscribe the sweep of its holding both unpersuasive and disingenuous. What are the circumstances in this case that make it unusual? Police had probable cause to believe defendant had recently become intoxicated and had driven home and that he was now inside his house. Police lacked both a warrant and consent to enter. Defendant's body was naturally metabolizing the alcohol, but that would be true in every crime involving alcohol. Defendant might consume additional alcohol, thereby corrupting the evidence, but that possibility, too, would exist in every case involving an alcohol-related crime. Police, in any event, had no articulable facts to suggest defendant was about to drink anything. Under the majority's reasoning,

therefore, it would appear that any time police have probable cause to arrest someone for an alcohol-related crime (for which the possible penalty involves some jail time) and they reasonably believe the suspect is in his home, they may forcibly enter without a warrant to make an arrest to preserve the blood-alcohol evidence. One can only hope the majority's reasoning today is akin to "a restricted railroad ticket, good for this day and train only." (*Smith v. Allwright* (1944) 321 U.S. 649, 669 [88 L.Ed. 987, 64 S.Ct. 757] (dis. opn. of Roberts, J.).)

## II

That those enforcing our criminal laws will proceed vigorously is generally to society's benefit, but the Fourth Amendment to the United States Constitution places reasonable and recognizable limits on such activities. One such limit is that the warrantless entry into an individual's home is presumptively unreasonable unless justified by one of the narrow exceptions to the warrant requirement. By requiring, in all other situations, the interposition of the considered judgment of a neutral magistrate, the Constitution protects the citizenry's reasonable expectation of privacy in their homes. As Justice Robert Jackson explained: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (*Johnson v. United States* (1948) 333 U.S. 10, 13–14 [92 L.Ed. 436, 68 S.Ct. 367] (fns. omitted).)

The majority endorses a scheme today by which police may too easily evade the warrant requirement. Because I conclude its reasoning and result are contrary to the Fourth Amendment to the United States Constitution, I dissent.