Peter KNOWLES, Plaintiff,

v.

CITY OF BENICIA, Police Chief Sandra Spagnoli, City Manager Jim Erickson, Sergeant Frank Hartig, Sergeant Bob Oettinger, Sergeant Chris Bidou, Sergeant Scott Przekurat, Officer John McFadden, Officer Mark Menesini, Officer James Laughter, Officer Kevin Rose, Officer Jason Eakin, Officer, Ted Criado, Officer Jake Heinemeyer, and Does 1 through XXX, inclusive, Defendants.

No. CIV. 2:09–3470 WBS DAD.

United States District Court,
E.D. California.

March 25, 2011.

Gay Crosthwait Grunfeld, Leslie Chambers Mehta, Sanford Jay Rosen, Ernest Galvan, Rosen, Bien and Galvan, Geri Lynn Green, Law Offices of Geri Lynn Green, LC, San Francisco, CA, for Plaintiff.

Danielle K. Lewis, Gregg Anthony Thornton, Jennifer Lynn Rusnak, Selman

Breitman LLP, San Francisco, CA, for Defendants.

### MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY ADJUDICATION

WILLIAM B. SHUBB, District Judge.

Plaintiff Peter Knowles brought this action against defendants City of Benicia, Police Chief Sandra Spagnoli, City Manager Jim Erickson, Sergeants Frank Hartig, Bob Oettinger, Chris Bidou, and Scott Przekurat, and Officers John McFadden, Mark Menesini, James Laughter, Kevin Rose, Jason Eakin, Ted Criado, and Jake Heinemeyer, arising out of a series of alleged civil rights violations. The Complaint alleges various claims pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments.

Plaintiff now moves for summary adjudication on the issue of Frank Hartig's liability for violating plaintiff's Fourth Amendment rights by "arresting [plaintiff] in the attached garage at Plaintiff's residence without probable cause, consent, exigent circumstances, or a warrant" on December 23, 2007.[1] ([Proposed] Order Granting Pl.'s Mot. for Summ. Adjudication (Docket No. 45).)

### I. Factual and Procedural Background

Plaintiff alleges that Benicia police officers violated his constitutional rights on six different occasions, the first of which is relevant to the instant motion. The first occasion resulted in a state criminal case against plaintiff. In the criminal case,

plaintiff moved to suppress the evidence; the trial court denied the motion, but was reversed on appeal. See People v. Knowles, No. VCR200106 (Cal.App. Dep't Super. Ct. Apr. 6, 2009).

Plaintiff relies primarily on Hartig's testimony at the trial court's suppression hearing to support the instant motion. Hartig relies primarily on his deposition testimony in the instant action to oppose the motion. Hartig's testimony is substantially similar, although it does differ in some respects, which the court notes below. Where the testimony differs, the court views the evidence in the light most favorable to Hartig and draws all justifiable inferences in his favor because he is the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Hartig Testimony at Suppression Hearing

On December 23, 2007, Hartig was citing another driver in a gas station parking lot at 10 Solano Square when he heard "the sound of a revving engine and tires breaking traction." (Mehta Decl. in Supp. of Pl.'s Mot. for Summ. Adjudication ("Mehta Decl.") Ex. A ("Hartig Test.") at 4:10–13, 4:24–27 (Docket No. 43).) Hartig believed that the sound was from a red Jeep vehicle exiting a Safeway parking lot adjacent to 10 Solano Square, coming out onto the 100 block of Military West. (Id. at 4:18–21.) The sound drew Hartig's attention because "[i]t was midnight, and it's

---

1. Hartig objected to plaintiff's reply as containing a new argument (Pl.'s Reply to Mot. for Summ. Adjudication (Docket No. 77)) and new evidence (Mehta Decl. Re Reply in Supp. of Pl.'s Mot. for Summ. Adjudication (Docket No. 78)). (See Def. Hartig's Objections to New Evidence & Argument Submitted with Pl.'s Reply in Supp. of Mot. for Summ. Adjudication (Docket No. 82).) Plaintiff filed a response to the objection, arguing that his reply did not raise a new argument or new evidence and, in the alternative, agreeing to continue the hearing to allow Hartig to respond. (Pl.'s Req. to Reply & Reply to Def. Hartig's Objections to New Evidence & Argument Submitted with Pl.'s Reply in Supp. of Mot. for Summ. Adjudication (Docket 83).) The court continued the hearing and allowed Hartig the opportunity to respond.

illegal, and it was loud, and it's a moving infraction." (*Id.* at 5:1–2.)

The vehicle "continued to accelerate" and break traction and, as the driver passed Hartig, the driver "kind of let off the gas a little bit" and "kind of looked in [Hartig's] direction" and Hartig looked at the driver. (*Id.* at 5:7–12.) The vehicle then accelerated into the 300 block of Military West, reaching an estimated speed of "at least 60 miles an hour." (*Id.* at 5:10–16.) The speed limit is thirty-five miles per hour where Hartig first observed the vehicle; it then changes to forty miles per hour. (*Id.* at 5:17–19.) Hartig then told dispatch the description of the vehicle and driver and "advised them what was going on." [2] (*Id.* at 5:22–24.) After giving the driver in the parking lot "his stuff back," Hartig attempted to catch up to the vehicle. (*Id.* at 5:24–26.)

Hartig "continued westbound towards the west side of Military where [he] completely lost sight of the vehicle." (*Id.* at 6:13–15.) Another officer informed Hartig that he had observed taillights further down Military West, but Hartig later determined that it was not the vehicle that he had seen. (*Id.* at 6:15–18.) Hartig continued to drive and eventually took a right onto South Hampton Road. (*Id.* at 6:18–26.) Hartig then "observed the red Jeep coming, as if it had not stopped, at West 7th to South Hampton," and the vehicle drove past Hartig in the opposite direction. (*Id.* at 6:26–7:5.) Hartig looked at the driver and "assume[d] [the driver] saw [Hartig]," and the vehicle "accelerated and took off again out of [Hartig's] view." (*Id.* at 7:7–9.) When asked how fast the car was traveling, Hartig stated: "The speed limit is, I believe, 35 in that area. Maybe a little bit faster in that area." (*Id.* at 7:12–13.)

Hartig did not have his lights or sirens activated. (*Id.* at 7:14–16.) Hartig then told two officers at Military West and South Hampton that the vehicle "[was] coming right at [them]" and they "kind of stood by." (*Id.* at 7:18–21.) After finding a place where he could make a safe U-turn, Hartig then "gave chase, accelerated trying to catch up." (*Id.* at 7:21–23.) When one officer told him that the vehicle never showed up, Hartig "figured" the vehicle turned onto Devonshire, a side street off of South Hampton. (*Id.* at 7:23–26.)

After turning onto Devonshire, Hartig went down the first court on a "hunch," and he then "observed the taillights pulling into a residence on Stuart Court." (*Id.* at 7:27–8:1.) When Hartig first observed the vehicle, it was pulling into the garage or into the driveway, and eventually the vehicle stopped in the garage. (*Id.* at 8:2–10, 9:25–10:4.) Hartig then parked his vehicle probably in the street or partially in the street and the driveway. (*Id.* at 10:15–17.) Without a warrant, Hartig ran up the driveway and into the garage. (*Id.* at 8:13.) Hartig "made contact with the driver, pulled him out of the vehicle and handcuffed him." (*Id.* at 8:15–16.) Hartig stated that he also turned the ignition off. (*Id.* at 10:10–11.) The driver was the plaintiff.

Hartig stated that his reasons for arresting plaintiff were that "[h]e had already evaded [him] and what [he] considered the exhibition of speed, or breaking traction, down Military West." (*Id.* at 8:18–

---

**2.** Plaintiff requests that the court take judicial notice of the "CAD printout," which appears to be a computer-generated police dispatch report. The court denies plaintiff's request because the fact is "subject to reasonable dispute." Fed.R.Evid. 201(b); *see, e.g., Gar-* *ber v. Barragan*, No. CV 07–7254, 2009 WL 1649071, at *1 (C.D.Cal. June 9, 2009) ("The LAPD call record, the LAGSD police incident log report, and the Report of Office Hearing ... are not proper subjects of judicial notice.").

20.) Hartig observed "[w]ithin just a couple of minutes of taking [plaintiff] out of his vehicle" an odor of alcohol on his breath, bloodshot eyes, and balance that "wasn't real great." (*Id.* at 8:24–27, 16:8–11.) Hartig also later observed slurred speech. (*Id.* at 8:27–28.) Hartig later determined that plaintiff was intoxicated beyond the legal limit. (*Id.* at 9:4–10, 16:15–16, 17:3.)

While plaintiff was charged with driving under the influence, "he was originally arrested for reckless driving and the exhibition of speed." (*Id.* at 9:12–14.) Hartig agreed that his "obligation" when he entered the garage was to arrest the driver for speeding (*id.* at 10:25–27), but he "suspected" driving under the influence. (*Id.* at 11:10–16.)

When Hartig searched plaintiff's wallet, he found a Safeway receipt in it. (*Id.* at 13:2–11.) Hartig also had the vehicle searched and towed from the garage. (*Id.* at 13:28–14:1.)

### B. *Hartig Deposition Testimony in Instant Action*

Hartig testified at his deposition that he heard breaking traction, which means "burning rubber." (Full Hartig Dep. at 148:10–13.[3]) The loss of traction is "an acceleration where the friction of the tires cannot grab the asphalt, because the tires are spinning so fast." (*Id.* at 148:16–19.) Hartig estimated that the loss of traction lasted three to five seconds. (*Id.* at 148:22.) Hartig assumed that the breaking of traction started as the vehicle

turned out of the parking lot. (Thornton Decl. in Supp. of Defs.' Opp'n to Pl.'s Mot. for Summ. Adjudication ("Thornton Decl.") Ex. A ("Hartig Dep."), at 153:23–154:4 (Docket No. 72).)

Hartig stated that he had his strobe lights on at the time and that he and the driver "looked at each other" and that Hartig "got a good visual look at him." [4] (Thornton Decl. Hartig Dep. at 158:25, 156:9, 156:19–20.) Hartig "felt" that they "made eye contact." (*Id.* at 158:16–17.) Hartig then told dispatch that "there was a white male in a lifted red Jeep with big tires, wearing a—either cap or hat—black cap or hat—that was breaking traction, all over the road." (*Id.* at 157:1–4.) Hartig described the vehicle as "all over the road" because it was breaking traction: "You don't have control of the vehicle when your rear tires are spinning. In my opinion, you are all over the road; you have no control." (*Id.* at 157:7–10.)

Hartig made clear that his opinion that the driver was not in control was based on what he heard, not what he saw: "I could hear it. I didn't see it lose control, but I could hear the tires accelerating. They weren't grabbing traction, and the vehicle was in a turning movement." (*Id.* at 158:9–12.)

Hartig decided to pursue the vehicle and to not continue to cite the other driver in the gas station parking lot for the following reasons: "He actually had a couple of things combined. You've got the speed, the breaking of the traction—which is exhibition of speed. And taking off after we

---

**3.** This portion of Hartig's deposition was not included in the portion of the deposition attached to the affidavit. A paper copy of the full deposition was provided to the court pursuant to Local Rules 133(j) and 250.1(a). A court may consider other materials in the record not cited on a motion for summary judgment. Fed.R.Civ.P. 56(c)(3). The court will cite the paper copy of the full deposition as "Full Hartig Dep."

**4.** Hartig's deposition testimony regarding whether the driver of the vehicle looked at him seems to supplement his answer at the suppression hearing, in which he stated that the driver "kind of looked in [Hartig's] direction." (Mehta Decl. in Supp. of Pl.'s Mot. for Summ. Adjudication Ex. A at 5:9 (Docket No. 43).)

made eye contact. There was no doubt he didn't want to be there." (*Id.* at 161:8–12.) Hartig supplemented his answer when asked again: "That [other citation] was probably just a mechanical ticket, in all probabilities. Here I have a moving violation, and I have someone that potentially could be under the influence." (Full Hartig Dep. at 162:8–11.)

Hartig also stated: "And I ran up there and gave him his stuff back, because that breaking traction, the erratic driving coming out of that short time, and then followed up by 'I don't want to be here anymore'—that was my perception—was potentially it could be a drunk driver." (Thornton Decl. Hartig Dep. at 163:10–14.) Hartig did not think that the driver actually saw him return the paperwork to the other driver: "I was probably eight, ten feet off the car. I think he saw me walking—potentially he could have seen me walking towards the car [to return the paperwork], but there is no way he saw me return the stuff, because he took off." (Full Hartig Dep. at 161:23–162:2.)

Hartig stated that it took him "[m]aybe a couple of minutes" between the time that he last saw the vehicle and when he turned onto South Hampton.[5] (Thornton Decl. Hartig Dep. at 168:18–22.) Hartig then stated: "So we passed, and I saw the driver—you know, like that—I saw a white male, the truck, as we go by. And he just floored it again and took off from me." (*Id.* at 169:25–170:2.)

On his decision to turn onto Devonshire when he heard from the officers ahead of him that the vehicle had not reached them, Hartig stated: "And right then I knew if he hadn't gotten to them, he had to have—you know, he could have turned up Hastings, but—I might have seen that. But I couldn't have seen him turn up Devon-

shire, so that was the only way he could have gone." (*Id.* at 170:11–15.)

On his decision to turn onto Stuart, Hartig stated: "[W]hether it is instinct, good police work, luck—whatever you want to call it—I thought, 'Well, he had to have gone left on Stuart.'" (Full Hartig Dep. at 173:11–14.) Hartig stated that at no point did he activate his emergency lights or siren (*id.* at 174:14–17, 179:13–16), and he does not recall whether he turned on his strobe lights when he parked in front of the residence. (*Id.* at 179:22–24.)

While Hartig testified at the suppression hearing that he turned off the ignition of plaintiff's vehicle, when asked at the deposition if the vehicle was still running, he stated:

I thought about this.

I thought it was, but right now I don't recall.

I know that I later reached and took the keys out of the ignition, but right now today, did I turn the car off; was it running? I don't 100 percent remember.

(*Id.* at 182:8–12.) Hartig's reasons for pulling plaintiff out of the vehicle were: "I was going to place him under arrest for reckless driving, and the breaking traction; the speed contest—that I felt [sic] the laws that he violated right there—which are both misdemeanors—I can effect an arrest. And to take control of him." (*Id.* at 183:5–9.)

When asked what his intent was when he was leading plaintiff to his patrol car, Hartig seemed to supplement his previous answer:

Well, I can smell the alcohol on him now. Again, going up the driveway I truly thought I had a drunk driver, too.

I have arrested a lot of drunk drivers in my life. His actions that night: the

5. The deposition testimony transcript refers to this road as "Southhampton Road." For con-

sistency, the court will continue to refer to it as "South Hampton Road."

speeding of the vehicle, the—I feel the wanton disregard for the way he was driving; his safety; my safety; everyone trying to catch up to him and locate him—the way he was driving, I truly feel that's one of the—his driving observations [sic] were consistent with people under the influence.

So, as I mentioned, he was getting arrested for reckless driving. When I first—again, when I first contacted him is when I smelled the alcohol. When I got him back to the car, there's no doubt that I'm going to do at some point a DUI investigation on this.

(Thornton Decl. Hartig Dep. at 185:3–17.)

Hartig explained what he found in the vehicle that convinced him that plaintiff was the driver of the vehicle that Hartig had observed earlier despite plaintiff's denials:

We talked about the initial—I told him what he had done. He denied it, and says he wasn't down there. And I'm not sure if it was at that point where I had opened his wallet and found a Safeway receipt. And honestly I probably called him a liar and said, "Look, here you were, down there."

I don't recall if I said that, but I probably explained that.

And then when I had—I think it was Officer Heinemeyer tow the vehicle, I had him search the vehicle, and I believe that—I had him look for a cap. And sure enough, there's a cap in the vehicle.

And then I think actually the receipt—the stuff that was on the receipt, that was dated about the same time this whole thing started—was in the front of the car—I believe on the front seat or front floor board of the car.

(Full Hartig Dep. 196:15–197:6.)

### C. *People v. Knowles*

The state charged plaintiff with violating California Vehicle Code sections 23109(a) (speed contest) and 23152(a) and (b) (driving under the influence of alcohol). *Knowles*, at 1:20–24. Following the trial court's denial, based on the exigent circumstance of hot pursuit, of his motion to suppress the evidence, *id.* at 5:15–6:1, plaintiff pled guilty to driving under the influence and appealed the denial of his motion. *Id.* at 1:22–24. The appellate court reversed the denial of his motion, suppressing all evidence obtained by Hartig after he crossed the threshold of the garage.[6] *Id.* at 7:7–8.

---

**6.** The appellate court found that "the record [did] not support an objective finding that [plaintiff] was attempting to flee from or evade Officer Hartig," *People v. Knowles*, No. VCR200106, at 4:19–20 (Cal.App. Dep't Super. Ct. Apr. 6, 2009), a finding that the trial court had based "solely on the officer's subjective belief." *Id.* at 5:4–5. The court found Hartig's observations about the driver of the vehicle looking at him insufficient. The court further explained:

The record contains no evidence that [plaintiff] even knew police were looking for his Jeep, but only describes Officer Hartig's quest for the Jeep up and down various streets.... [T]he description of Officer Hartig's search suggests a substantial lapse in time. The one time Officer Hartig encountered the moving Jeep, it was going the

other direction, and there was never any opportunity to try to stop the [plaintiff] as he was driving.

*Id.* at 4:22–5:4 (footnote omitted).

The appellate court then went on to hold that exigent circumstances did not justify the failure to obtain a warrant:

This is not a case of hot pursuit. Police never actually followed the Jeep. Emergency lights were never activated. There is no evidence that [plaintiff] even knew an officer was looking for him. There was only a hunt and a find on a hunch by a law officer with good instincts. [Plaintiff] did not resist a prior attempt to detain him. [Plaintiff] did not retreat into his house in an effort to avoid arrest. [Plaintiff] was not a fleeing felon. The officer's interest in entering the garage was to arrest [plaintiff] for a traffic violation. [Plaintiff] had already ar-

## II. *Discussion*

A party may move for summary judgment on part of a claim. Fed.R.Civ.P. 56(a); *see Dev. Acquisition Grp. v. eaConsulting, Inc.,* No. 2:08–cv–03008 MCE JFM, 776 F.Supp.2d 1161, 1163, 2011 WL 837162, at *2 (E.D.Cal. Mar. 08, 2011) ("Rule 56 also allows a court to grant summary adjudication on part of a claim or defense."). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment ...." *Id.* "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2).[7]

### A. *Collateral Estoppel*

■ State court judgments may preclude the relitigation of an identical issue that arises in a subsequent federal civil rights action. *Allen v. McCurry,* 449 U.S. 90, 103–04, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Hawkins v. Risley,* 984 F.2d 321, 323 (9th Cir.1993). "Federal courts should apply the state's collateral estoppel law in determining whether a § 1983 claim is precluded by a prior state judicial proceeding." *Presley v. Morrison,* 950 F.Supp. 1298, 1305 (E.D.Pa.1996); *see Allen,* 449 U.S. at 96, 101 S.Ct. 411.

■ In California, collateral estoppel will be applied only when certain threshold requirements are met:

First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have actually

---

rived home and presented no threat to public safety. Nor was there further chance for escape.
*Id.* at 6:16–22.

7. Here, Hartig's only evidentiary objection is to the state appellate court decision. (Def. Hartig's Response to Pl.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. Adjudication (Docket No. 70).) It appears that Hartig's objection is to the decision only to the extent that it is being offered for the truth of the factual findings and conclusions of law. Because the decision is not being offered for this purpose, the court overrules the objection.

been litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom the preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido v. Super. Ct. of Mendocino Cnty.,* 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 795 P.2d 1223 (1990).

■ "[I]dentity of parties or privity is a requirement of due process of law." *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 874, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978). Privity exists where "the non-party is sufficiently close to the original case to afford application of the principle of preclusion." *People v. Drinkhouse,* 4 Cal. App.3d 931, 937, 84 Cal.Rptr. 773 (1st Dist. 1970); *accord Martin v. Cnty. of L.A.,* 51 Cal.App.4th 688, 700, 59 Cal.Rptr.2d 303 (2d Dist.1997). The California Supreme Court has held:

> In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, and adequate representation by, the losing party in the first action as well as that the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.

*Clemmer,* 22 Cal.3d at 875, 151 Cal.Rptr. 285, 587 P.2d 1098.

■ The Ninth Circuit has held that police officers are not in "privity" with the prosecution in a criminal case when the officers have "no measure of control" over the proceeding or "direct personal interest" in its outcome. *Davis v. Eide,* 439 F.2d 1077, 1078 (9th Cir.1971) (per curiam). While *Davis* was decided before the United States Supreme Court held that federal courts must look to state law to determine preclusive effect, *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), its reasoning remains sound. Moreover, the fact that individual officers do not have counsel in connection with a criminal case is "critical" to the determination of whether they had a "full and fair opportunity" to litigate the issue. *See Yezek v. Mitchell,* No. C–05–03461, 2007 WL 61887, at *5 (N.D.Cal. Jan. 8, 2007).

Several courts in this district have held that a state court's determination that a police officer violated the Fourth Amendment as a way of dismissing a criminal case or suppressing evidence did not bar relitigation of the officer's alleged Fourth Amendment violations in a subsequent civil suit against the officer. *See Adams v. Nocon,* No. CIV. S–07–02083 FCD EFB, 2009 WL 799278, at *4 (E.D.Cal. Mar. 23, 2009); *Saunders v. Knight,* No. CV F 04–5924 LJO WMW, 2007 WL 3482047, at *8–9 (E.D.Cal. Nov. 13, 2007); *Willis v. Mullins,* No. CIVF046542 AWI LJO, 2005 WL 3500771, at *6–7 (E.D.Cal. Dec. 16, 2005) ("While police do aspire to enforce the law, individual officers cannot be said to have a personal stake in ensuring conviction."); *Sanders v. City of Bakersfield,* No. CIV–F 04–5541 AWI TAG, 2005 WL 6267361, at *13–14 (E.D.Cal. Sept. 30, 2005).

Because Hartig was not a party or in privity with a party to the state court proceeding, nor did he have a full and fair opportunity to litigate the issue of his alleged Fourth Amendment violation, the decision made by the state court regarding the suppression of evidence has no binding effect in this litigation as to Hartig's liability for a Fourth Amendment violation.

## B. *Merits of Instant Motion*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. "The Fourth Amendment protects against warrantless arrest inside a person's home in the same fashion that it protects against warrantless searches of the home, which is to say that police officers may not execute a warrantless arrest in a home unless they have both probable cause and exigent circumstances." *Hopkins v. Bonvicino*, 573 F.3d 752, 773 (9th Cir.2009) (holding that because exigent circumstances did not justify warrantless home entry, exigent circumstances did not justify warrantless home arrest).

Here, the California statutes for which plaintiff could possibly have been subject to arrest are the statutes prohibiting driving under the influence of alcohol, Cal. Vehicle Code §§ 23152, 23536, engaging in a speed contest or exhibition of speed, *id.* § 23109, and reckless driving, *id.* § 23103. Even if probable cause existed, Hartig did not have a warrant, so plaintiff is entitled to summary adjudication if he can show that there is no genuine issue of material fact that an exigency did not exist.

The exigent circumstances exception to the warrant requirement "is premised on 'few in number and carefully delineated' circumstances in which 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search [or seizure] is objectively reasonable under the Fourth Amendment.'" *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir.2010) (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126

S.Ct. 1943, 164 L.Ed.2d 650 (2006)) (citation omitted).

The Ninth Circuit has defined those circumstances as "(1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect[,] and (4) the need to prevent the escape of a suspect."[8] *Id.* The parties dispute the applicability of the exigent circumstances of hot pursuit and prevention of the destruction of evidence.

In *Hopkins*, the Ninth Circuit held that the investigation of the misdemeanor of driving under the influence did not create an exigent circumstance.[9] *Hopkins*, 573 F.3d at 769. For the following reasons, this court concludes that *Hopkins* forecloses a finding of an exigent circumstance in this case.

■ The hot pursuit exigent circumstance provides that the "act of retreating into [a] house [cannot] thwart an otherwise proper arrest." *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). This exception "only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir.2001) (en banc) (per curiam) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)). As the name implies, there also must actually be a chase. *Santana*, 427 U.S. at 42–43, 96 S.Ct. 2406 ("The District Court was correct in concluding that 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about (the) public streets.'").

---

8. However, as the Fourth Amendment "ultimately turns on the reasonableness of the officer's actions in light of the totality of the circumstances," this is a non-exhaustive list. *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir.2010).

9. *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir.2009), was decided *after* the conduct at issue in this case.

■ The court finds the evidence insufficient to create a genuine issue as to whether a "chase" occurred, as required to establish hot pursuit. *Id.; see, e.g., Struckman*, 603 F.3d at 744 ("There was no chase here—no 'pursuit' of [the criminal defendant], hot or cold. [The defendant] was already inside the backyard when the police officers arrived at the house. Although the officers entered the yard to handcuff [the defendant] and take him into custody, they were not chasing him; [the defendant] immediately stopped walking through the backyard when he saw the officers, and he then complied with their orders. Those same facts make clear that [the defendant] made no attempt to escape the yard. Indeed, [the officer] expressly testified that [the defendant] made no attempt to flee.").

The evidence only shows that Hartig was searching for the vehicle for a couple of minutes. The evidence does not show that plaintiff was fleeing from Hartig. Hartig never activated his emergency lights or siren at any time, even when he saw the vehicle for the second time on South Hampton. The court finds Hartig's testimony about the driver of the vehicle looking at Hartig before accelerating and exceeding the speed limit insufficient in light of the other evidence. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].").

The court recognizes that Hartig testified that he "perce[ived]" that the driver of the vehicle thought, " 'I don't want to be here anymore,' " and that "[t]here was no doubt he didn't want to be there." (Thornton Decl. Hartig Dep. at 163:12–13, 161:11–12.) Hartig also testified that when he saw the vehicle on South Hampton the "[driver] took off from me." (*Id.* at 170:2.)

Even if Hartig believed he was engaged in a chase,[10] his subjective beliefs are irrelevant to the hot pursuit exigent circumstance determination. *See Struckman*, 603 F.3d at 744 ("In support of its contention that the exigency exception is applicable here, the government relies heavily on [the officer's] testimony that once [the criminal defendant] shed his jacket, he *believed* that [the defendant] *intended* to flee or fight the officers free of an encumbrance.... [H]owever, an officer's subjective motivation for his actions is irrelevant in determining whether his actions are reasonable under the Fourth Amendment."). Accordingly, as no chase occurred, the exigency of hot pursuit is inapplicable here.

■ Even if a genuine issue of fact existed as to whether Hartig was preventing the destruction of evidence or in hot pursuit, Ninth Circuit law holds that while the offense being a misdemeanor "does not definitely preclude a finding of exigent circumstances," "it weighs heavily against it." *Johnson*, 256 F.3d at 908. In *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091 (rejecting state's attempt to justify arrest of nonjailable offense of driving under influence by relying on hot pursuit, threat to public safety, and need to preserve evidence of blood-alcohol level [11]), the Supreme Court held that "an important factor to be con-

---

**10.** Based on this testimony, it is not even clear that Hartig subjectively thought he was engaged in a "chase."

**11.** The Supreme Court rejected the justifications of hot pursuit and threat to public safety without even considering the minor nature of the underlying offense:

On the facts of this case, however, the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime. Moreover, because the petitioner had already arrived home, and had abandoned his car at the scene of the accident,

sidered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made" and that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed."

The Ninth Circuit has since "[b]uil[t] on the felony/misdemeanor distinction discussed in *Welsh.*" *Hopkins*, 573 F.3d at 769. *But cf. Struckman*, 603 F.3d at 745 ("And, while we recognize that 'the exigency analysis must turn on the *gravity* of the underlying offense, ... not its status as jailable or nonjailable,' 'the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense.' " (quoting *Hopkins*, 573 F.3d at 768; *Welsh*, 466 U.S. at 754 n. 14, 104 S.Ct. 2091)) (omission in original). The Ninth Circuit has described *Welsh* as standing for the proposition "that an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 956 (9th Cir.2000); *see also Johnson*, 256 F.3d at 908 n. 6 ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." (quoting *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091)).

In holding that the investigation of the misdemeanor of driving under the influence was not an exigent circumstance, *Hopkins* relied on *Welsh*:

> Because *Johnson* and *LaLonde* relied on and directly cited *Welsh* for the proposition that investigation of a misdemeanor will rarely, if ever, support exigent circumstances, it is clear that, whatever 'rare' circumstances might justify a warrantless home entry to investigate a misdemeanor, misdemeanor driving while under the influence, the very offense at issue in *Welsh* and cited by *Johnson*, does not fall within that very narrow exception.

*Hopkins*, 573 F.3d at 769 (citation omitted). In so holding, the Ninth Circuit disagreed with the California Supreme Court, *see People v. Thompson*, 38 Cal.4th 811, 820–28, 43 Cal.Rptr.3d 750, 135 P.3d 3 (2006), which had distinguished *Welsh* on the basis that Wisconsin's offense of driving under the influence was a nonjailable offense and had held that preservation of evidence of California's jailable offense of driving under the influence was an exigent circumstance.[12]

---

there was little remaining threat to the public safety.

*Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). On the preservation of evidence argument, the Court held:

> The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible. This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest. Given this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood

alcohol level might have dissipated while the police obtained a warrant.

*Id.* at 754, 104 S.Ct. 2091.

12. The interpretation of *Welsh* in *People v. Thompson*, 38 Cal.4th 811, 822, 43 Cal.Rptr.3d 750, 135 P.3d 3 (2006), relied in part on *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), which involved restraining a suspect from entering his home and in which the Court arguably drew a distinction between jailable and nonjailable offenses. *Thompson* also relied on "[a] substantial majority of [their] sister jurisdictions hav[ing] limited *Welsh's* holding to nonjailable offenses and hav[ing] thereby rejected defendant's extension of its rule to misdemeanor offenses where imprisonment is a

The Ninth Circuit was unpersuaded by *Thompson*'s distinction:

> [T]his is *not* the distinction that the United States Supreme Court drew in *Welsh,* nor is it the distinction that this circuit has repeatedly emphasized in its own exigency-exception decisions. To the contrary, in *Welsh* the Supreme Court held that the exigency analysis must turn on "the *gravity* of the underlying offense," not its status as "jailable" or "nonjailable." The Court specifically said that a finding of exigent circumstances is particularly inappropriate "when the underlying offense ... is relatively minor," and cited favorably "those courts addressing the issue [that] have refused to permit warrantless home arrests for *nonfelonious* crimes." The Supreme Court expressly did not limit its holding in *Welsh* to nonjailable offenses; to the contrary, it suggested that exigent circumstances can rarely, if ever, support entry into a home to investigate or arrest someone for a misdemeanor offense.

*Hopkins,* 573 F.3d at 768–69 (quoting *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091; *id.* at 750, 104 S.Ct. 2091; *id.* at 752, 104 S.Ct. 2091) (omission and second alteration in original) (footnote and citations omitted).

The Ninth Circuit in *Hopkins* further explained why it would not follow the California Supreme Court: "It is the federal courts that are the final arbiters of federal constitutional rights, not the state courts. This court's precedents make clear that a warrantless home entry to obtain evidence of a misdemeanor offense is 'seldom, if ever' constitutional, and that it was certainly unconstitutional here." *Hopkins,* 573 F.3d at 769 (quoting *LaLonde,* 204 F.3d at 956) (citation omitted).

Subsequent to the Ninth Circuit's decision, which upheld in part the district court's denial of the officers' motion for summary judgment on qualified immunity, the district court granted the plaintiff's motion for summary adjudication on the issue of some of the officers' Fourth Amendment liability. *Hopkins v. Bonvicino,* No. C 05–02932, 2010 WL 3743562, at *4 (N.D.Cal. Sept. 17, 2010).

Similarly, in *Kolesnikov v. Sacramento County,* No. Civ. S–06–2155, 2008 WL 1806193 (E.D.Cal. April 22, 2008) (Beistline, J.), the court addressed hot pursuit of plaintiffs who were suspected of committing misdemeanors similar to the misdemeanors at issue in this case. In granting summary adjudication for one plaintiff on the warrantless entry claim, the court relied in part on the relatively minor nature of the offenses: "Although it is clear that the officers were in 'hot pursuit' of [the plaintiff], the fact that [the plaintiff] was only wanted for relatively minor offenses (e.g., misdemeanor reckless driving, misdemeanor evading, misdemeanor resisting arrest and failure to wear a helmet) weighs heavily against a finding of exigent circumstances." *Id.* at *5 (footnotes omitted). *But see id.* at *6 (granting qualified immunity)

Here, all of plaintiff's possibly applicable offenses were misdemeanors. *See* Cal.Penal Code § 17 (defining misdemeanor). The misdemeanor status of the offenses at issue "weighs heavily" against a finding of exigent circumstances. *Johnson,* 256 F.3d at 908; *see also id.* at 908 n. 6 ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases." (quoting *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091)); *LaLonde,*

potential penalty." *Thompson,* 38 Cal.4th at 822–23, 43 Cal.Rptr.3d 750, 135 P.3d 3 (collecting cases).

204 F.3d at 956 ("[A]n exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home.").

In sum, the court finds that *Hopkins* forecloses the application of the exigent circumstance of preventing the destruction of evidence. The exigency of hot pursuit is inapplicable because no chase occurred. Furthermore, the misdemeanor status of the offenses weighs heavily against a finding of an exigent circumstance. Thus, while probable cause may have existed, the court will grant plaintiff's motion for summary adjudication on the issue of Hartig's liability for violating plaintiff's Fourth Amendment rights by arresting him on December 23, 2007.

### C. Qualified Immunity

■ Hartig did not formally move for summary judgment on his defense of qualified immunity, but he opposes the instant motion in part on qualified immunity grounds. To determine whether an official is entitled to qualified immunity, a court may begin with the question of whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 235–37, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that the *Saucier* two-step procedure for determining qualified immunity in which the court must first determine whether there is a constitu-

tional violation is not mandatory). Here, the court has already found a constitutional violation.

The second question the court must ask is whether the officer's conduct violated a clearly established right. *Id.* Finally, if the right is clearly established, the court should then determine whether a reasonable officer would know that his conduct violated the clearly established right. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). If the court finds the constitutional right was clearly established such that a reasonable officer would be aware that his or her conduct was unconstitutional, then the officer is not entitled to qualified immunity.[13] *Pearson*, 129 S.Ct. at 816.

With respect to the exigent circumstance of hot pursuit, the law was clearly established at the time of the incident that " 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about (the) public streets.' " *Santana*, 427 U.S. at 42–43, 96 S.Ct. 2406. The law was also clearly established that the exigent circumstance of hot pursuit "only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." *Johnson*, 256 F.3d at 907 (quoting *Welsh*, 466 U.S. at 753, 104 S.Ct. 2091).

A reasonable officer would know that Hartig's conduct did not amount to a hot pursuit under clearly established law. The evidence only shows a police officer driving throughout various streets in search of a driver who may have committed driving

---

**13.** "The threshold determination of whether the law governing the conduct at issue is clearly established is a question of law for the court." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993). The determination of whether a reasonable officer would know that his conduct violated the clearly established right is also a question of law. *Id.* A court may not determine qualified immunity at the summary judgment stage when there is a factual dispute as to "the facts and circumstances within an officer's knowledge" or "what the officer and claimant did or failed to do." *Id.* Here, considering the evidence in the light most favorable to defendant, and therefore resolving any factual disputes in his favor, for purposes of ruling upon this motion, the court finds no factual disputes precluding it from determining the issue of qualified immunity.

misdemeanors in the officer's presence. After searching for a couple of minutes, on a hunch, Hartig turned down the street where he found plaintiff. The evidence does not show that Hartig observed plaintiff fleeing from Hartig or that Hartig activated his emergency lights or siren at any time, even when he spotted the vehicle for the second time. Hartig's testimony that the driver looked at Hartig, apparently for at most a couple of seconds, before accelerating and exceeding the speed limit, in Hartig's estimate, is insufficient to entitle Hartig to qualified immunity.[14]

With respect to the exigent circumstance of preventing the destruction of evidence, even if probable cause existed that plaintiff was driving under the influence, the law was clearly established such that a reasonable officer would know in 2007 that an investigation of driving under the influence was not an exigent circumstance. In *Hopkins*, the Ninth Circuit broadly defined the clearly established law:

> As for the exigency exception, [ ] our conclusion[ ] that ... an investigation of a potential misdemeanor drunk-driving incident does not create an exigent circumstance w[as] clearly established at the time the officers broke into the plaintiff's home.... It was [ ] clearly established by 2003 that "an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." Moreover, we made clear a year later, in *United States v. Johnson*, that "where the underlying offense is only a

misdemeanor," *such as the misdemeanor drunk-driving* at issue in *Welsh*, "law enforcement must yield to the Fourth Amendment."

. . .

Thus, with respect to the lack of probable cause and the lack of exigent circumstances—the absence of either one of which would preclude the officers' reliance on the exigency exception—the law as to both was clearly established in 2003 and the officers are not entitled to qualified immunity on the basis of that exception.

*Hopkins*, 573 F.3d at 771–72 (quoting *LaLonde*, 204 F.3d at 956; *Johnson*, 256 F.3d at 909 n. 6) (citation omitted); *see also Huff v. City of Burbank*, 632 F.3d 539, 548–49 (9th Cir.2011).

The Ninth Circuit's qualified immunity holding was not affected by the California Supreme Court's holding in *Thompson*. As *Hopkins* explained, "a decision by a state court contrary to a holding of this court cannot unsettle or 'de-establish' the clarity of *federal law*.... [W]e have held that '[i]n the Ninth Circuit, we begin our inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end.'" *Id.* at 772 (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir.2004)) (second alteration in original).

Even though *Hopkins* was decided after the conduct at issue in this case, this court

---

**14.** Even if a reasonable officer would have believed he was engaged in a hot pursuit, the court would still have to resolve the issue of qualified immunity against Hartig. In *Garcia v. City of Imperial*, No. 08cv2357, 2010 WL 3834020, at *8 (S.D.Cal. Sept. 28, 2010), the court, citing *Hopkins*, held that in 2007 "the law was clear that where there is probable cause to believe that an individual has committed or is committing a misdemeanor only, an officer *ordinarily* may not enter into the individual's home without a warrant solely to arrest the individual or to investigate the misdemeanor." *Id.* (emphasis added). However, the court in *Garcia* found qualified immunity because "it was not clear whether exigent circumstances exist where a suspect in a misdemeanor case flees to a home that officers do not know is his, enters the backyard by jumping over a wall, and ends up in close proximity to points of entry into the residence, which may or may not be occupied." *Id.* The circumstances in this case were not out of the ordinary as in *Garcia*.

would have to disagree with the reasoning in *Hopkins* to find that Hartig is entitled to qualified immunity. *Hopkins* effectively forecloses a finding of qualified immunity. Accordingly, in light of the Ninth Circuit's broad holding in *Hopkins,* Hartig is not entitled to qualified immunity.

IT IS THEREFORE ORDERED that plaintiff's motion for summary adjudication on the issue of Frank Hartig's liability for violating plaintiff's Fourth Amendment rights by arresting him on December 23, 2007, be, and the same hereby is, GRANTED.